UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| GREGORY K. SENTERS SR., § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | No. 3:09-cv-1519-M |
| § | |
| SEDGWICK CLAIMS MANAGEMENT § | |
| SERVICES, INC. and AT&T UMBRELLA § | |
| BENEFIT PLAN NO. 1, § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gregory K. Senters filed this suit under the Employee Retirement Income Security Act ("ERISA"), complaining that Defendants wrongfully denied him disability benefits and breached their fiduciary duties. Senters initially brought suit against AT&T Services, Inc. and Sedgwick Claims Management Services, Inc. AT&T Services and Sedgwick jointly moved for summary judgment, arguing that neither of them was a proper party to an ERISA claim, and that, even if one or both of them were proper parties, Senters could not assert a breach of fiduciary duty claim under ERISA.

On September 15, 2010, the Court held a hearing on the Motion for Summary Judgment, at the conclusion of which the Court granted the Motion in part, denied it in part, and carried it in part. Specifically, the Court granted summary judgment for AT&T Services on all claims because AT&T Services was not a proper party. The Court also granted summary judgment for both Defendants on Senters's claim for breach of fiduciary duty. However, the Court held that Sedgwick was a proper party to Senters's denial-of-benefits claim, and so denied summary judgment on that ground. Additionally, the Court allowed Plaintiff to file an amended complaint

naming AT&T Umbrella Benefit Plan No. 1 (the "Plan") as a defendant.[1] Thus, AT&T Services was dismissed from the suit, and the only claim left against the remaining Defendants, Sedgwick and the Plan, was one for wrongful denial of ERISA benefits under 29 U.S.C. § 1132(a)(1)(A).

On January 21, 2011, the Court conducted a bench trial. After careful consideration of the relevance evidence presented at the trial, the Court makes the following findings of fact and conclusions of law. For the reasons stated below, the Court will issue final judgment in favor of Defendants.

## FINDINGS OF FACT

1. Senters worked for Southwestern Bell Telephone Company ("SWBT") or its affiliate as a customer service representative starting in 1998. Senters's duties involved mostly sedentary work, such as typing and talking on the phone, but for particular jobs, his duties could include driving between work locations and contacting customers on their premises.

2. As an employee of SWBT, Senters was a participant in the AT&T Disability Income Program ("the DIP"), a program under the AT&T Umbrella Benefit Plan No. 1 (the "Plan"), which provides qualified employees benefits for short-term disability.

3. Under the DIP, Senters was qualified to receive short-term disability benefits if he was "totally disabled," as defined by the DIP. According to the terms of the DIP, "'Total Disability' for short-term disability [benefits] means that because of Illness or Injury, you are unable to perform all of the essential functions of your job or another available job assigned by

---

[1] On September 21, 2010, Senters filed his First Amended Complaint [Docket Entry #26] naming AT&T Umbrella Benefit Plan No. 1 (the "Plan") and Sedgwick as defendants. The First Amended Complaint also names AT&T Services, Inc. as a defendant, and contains the same fiduciary duty claims on which the Court granted all Defendants summary judgment. On September 30, 2010, the Court entered an Order stating that it assumed claims against AT&T Services, Inc. and claims for breach of fiduciary duty remained in the Amended Complaint for purposes of establishing the record only. The Court reiterated its prior holding that Senters would not be entitled to present evidence to the Court of any claim against AT&T Services, Inc. or of a claim for breach of fiduciary duty against any defendant.

your Participating Company within the same full-time or part-time classification for which you are qualified."

4. At all relevant times, Sedgwick Claims Management Services, Inc. was the third party administrator of the DIP and was responsible for the handling of disability benefits claims under the DIP. Specifically, Sedgwick was in charge of processing employees' claims, reviewing medical records and interpreting the DIP to determine claimants' entitlement to benefits, and deciding appeals of eligibility determinations.

5. Senters's first day of absence from work relevant to this lawsuit was January 23, 2007. Senters applied for short-term disability benefits, complaining that he was suffering from cardiomyopathy, congestive heart failure, malignant hypertension, and diabetes.

6. On February 5, 2007, Sedgwick received medical records from Forest Medical Care, describing visits by Senters to Dr. Ramon Garcia ("Dr. Ramon"), an internist who was Senters's primary care physician, on January 24 and 31, 2007. In the records, Dr. Ramon noted that Senters had several co-morbidities affecting his recovery from coronary artery disease, including uncontrolled hypertension, type II diabetes, and morbid obesity.

7. On February 7, 2007, Sedgwick wrote Senters, approving his claim for short-term disability benefits from January 30, 2007, through February 21, 2007, and informing him that updated medical documentation would be needed to extend the benefits beyond February 21.

8. On February 19, 2007, Sedgwick received medical records from Dr. Evelio Garcia ("Dr. Evelio"), a cardiologist, stating that Senters had malignant hypertension and cardiomyopathy, and probably also had underlying microvascular disease. The records also stated that Dr. Evelio had asked Senters not to perform any work.

9. On February 22, 2007, Sedgwick approved Senters's claim for short-term

disability benefits through March 20, 2007.

10. On March 7, 2007, Senters visited Dr. Evelio for follow-up care for his hypertension, cardiomyopathy, and diabetes. Records from that visit show that an echocardiogram and a stress test were performed, and revealed that Senters had severe left ventrical hypertrophy, with diastolic dysfunction, and an ejection fraction of 29%. In light of these results, Dr. Evelio recommended that Senters undergo another test, a "MUGA scan," and opined that Senters should be considered disabled because of the cardiomyopathy, malignant hypertension, hyperlipidemia, and diabetes. Dr. Evelio noted that he would see Senters again in three weeks.

11. On March 28, 2007, Sedgwick received the records of Senters's March 7 visit with Dr. Evelio, and approved Senters for short-term disability benefits through April 8, 2007.

12. On April 11, 2007, Senters visited Dr. Evelio to discuss the results of the MUGA scan. Dr. Evelio noted that the scan showed cardiomnyopathy with an ejection fraction of 39%. Dr. Evelio also noted that Senters appeared to suffer from global hypokinesis that was more pronounced in the anterior septal area of the left ventricle. The records from this visit did not address Senters's ability to return to work.

13. On April 23, 2007, before receiving the records from Senters's April 11 visit with Dr. Evelio, Sedgwick denied Senters's request to extend his short-term disability benefits beyond April 8, 2007. The letter notifying Senters of the denial states that Sedgwick had not received any medical information from Dr. Evelio since March 31, 2007.

14. On May 1, 2007, Sedgwick received the records from Senters's April 11 visit with Dr. Evelio but determined that the records had no impact on its benefits determination because the records did not address whether Senters could perform sedentary work.

15. On May 7, 2007, a Sedgwick representative spoke with Dr. Evelio over the phone. Dr. Evelio stated that Senters was permanently disabled and would not be able to return to work in any capacity. He stated that Senters's cardiomyopathy was a bad indicator of sudden death or congestive heart failure, that his heart had possibly suffered so much damage as to require the implantation of a defibrillator, and that his heart function was weak and he was fatigued most of the day. Dr. Evelio further noted that Senters had other underlying co-morbidities of diabetes and hypertension, which adversely impacted his recovery.

16. Based on the conversation with Dr. Evelio, Sedgwick approved Senters's claim for short-term disability benefits, effective April 9, 2007, through June 7, 2007.

17. Senters visited Dr. Brian Le, a cardiovascular specialist, on May 21, 2007. In the records of that visit, Dr. Le noted Senters's low ejection fraction, but also noted that Senters reported being able to walk several miles without limitation. Dr. Le stated that Senters was "Functional Class 1," which is a reference to the functional classification system of the New York Heart Association for assessing the stage of a patient's heart failure. Class I describes patients for whom ordinary physical activity does not cause undue fatigue, palpitation, or dyspnea. Dr. Le proposed that Senters have an Implantable Cardioverter Defibrillator ("ICD") implanted.

18. On June 6, 2007, Dr. Le implanted the ICD in Senters's left axillary.

19. On June 8, 2007, a Sedgwick representative spoke with "Vanessa" at Dr. Le's office. Vanessa stated her understanding that Senters would be permanently disabled. Sedgwick determined that Senters's recovery from the surgery supported a conclusion that Senters was unable to perform sedentary job duties, and approved his claim for short-term disability benefits through July 5, 2007.

20. On June 20, 2007, Senters had a follow-up visit with Dr. Evelio. Dr. Evelio noted that there were no complications from Senters's surgery, and that Senters reported he felt better and had a bit more energy, but also reported still feeling somewhat weak and getting short of breath with minimal effort. Dr. Evelio further noted that Senters's blood pressure was running on the low side. He concluded that Senters was disabled.

21. On July 12, 2007, Sedgwick received records of Senters's June 20 visit with Dr. Evelio. Liz Danley, a Sedgwick case manager handling Senters's claim, reviewed the records and determined that they did not provide a clear reason why Senters could not return to work in some capacity, concluding that the records indicated that, other than low blood pressure, Senters was stable.

22. Also on July 12, 2007, Danley determined to submit Senters's claim to a Physician Advisor ("PA") for review. Danley called Dr. Evelio to find out if he would be available the following Monday or Tuesday to speak with the PA for the review, but Dr. Evelio's office said he would not be available. Danley called Dr. Ramon with the same request, but his office also said he would not be available on Monday or Tuesday. Danley then called Senters to advise him that his claim was being sent to a PA for review.

23. On July 15, 2007, Dr. Neal J. Sherman, a physician specializing in internal medicine, reviewed the records of Senters's June 20 visit with Dr. Evelio and determined that they did not contain objective medical evidence preventing Senters from gradually returning to work. Specifically, Dr. Sherman found that Senters's cardiomyopathy had been medically treated, and noted that at the time of Senters's most recent office visit, his oxygen saturation level was 96%, his lungs were clear, and there was no documentation of abnormal oxygen saturation with activity. Dr. Sherman also noted that, other than Senters's hospital stay for his

ICD implantation, Senters had not been hospitalized in recent months for heart problems. Dr. Sherman further stated that although Senters had significant cardiac disease, the documentation demonstrated that Senters was capable of sustaining sedentary work activities such as sitting, talking, and typing. Based on those findings, Dr. Sherman suggested a graduated return to work, during which Senters would work four hour days for two weeks, six hour days for two weeks after that, and then eight hour days for all weeks thereafter.

24. On July 16, 2007, Sedgwick spoke with "Tammy" from Dr. Le's office, who informed Sedgwick that Senters was cleared to return to work from an electrical standpoint, but that any other issues concerning Senters's work status were within Dr. Evelio's area of responsibility.

25. On July 17, 2007, Sedgwick notified Senters of the results of Dr. Sherman's assessment. Senters told Sedgwick that Dr. Le had told him he could not work within 12–14 inches of a magnetic field, including those created by computers. Sedgwick responded that Dr. Le had already cleared him to return to work from an electrical standpoint.

26. SWBT informed Sedgwick on July 19, 2007, that it would be able to accommodate the modified return-to-work schedule suggested by Dr. Sherman.

27. Also on July 19, Sedgwick called Senters and informed him of his return-to-work schedule, which was set to begin on July 20. Sedgwick also informed Senters that his claim for short-term disability benefits was approved through July 19, 2007.

28. On July 20, 2007, Senters reported to work at 7:30 a.m., as scheduled. However, at 9:25 a.m., Senters said he had pain in his left arm and shoulder, and claimed that his doctor told him he could not work around all the electronic components in the building. Senters also reported having trouble breathing, and at 10:00 a.m. said he was leaving to see a doctor.

29. Later that day, Senters went to Presbyterian Hospital of Dallas and saw Dr. Le. Senters complained of chest pains and shortness of breath. Dr. Le concluded it was unlikely that Senters had suffered a cardiac event.

30. Because Senters returned to work on July 20, 2007, his previous claim for short-term disability benefits was closed and a new one was opened as of July 26, 2007, the date when Senters informed his SWBT supervisor that his doctor had advised him not to return to work until his next doctor's appointment. Senters claimed that he was not returning to work in order to ensure there was no electromagnetic interference with his ICD.

31. On July 30, 2007, Sedgwick called Senters and told him he was required to submit updated medical documentation no later than August 7, 2007 to support his claim of short-term disability benefits. Senters told Sedgwick he had not been in to see Dr. Evelio, who was out of town until August 13, 2007, but would instead see a Dr. Mallick, though he did not have an appointment.

32. Sedgwick called Senters again on August 7, 2007, and informed him that it had not received medical documentation to support his claim. Senters responded that he had still not seen his doctor but was scheduled to see Dr. Evelio on August 13, 2007. Senters also stated that although Dr. Mallick was Dr. Evelio's "back up," he had not seen Dr. Mallick, and that Dr. Evelio would have to handle the request for medical documentation when he returned.

33. On August 13, 2007, Sedgwick informed Senters that his claim for benefits was denied, effective July 26, 2007. The stated reason for the denial was Senters's failure to provide medical documentation to establish an inability to perform his job. The denial letter also informed Senters that any disability benefits received by Senters from July 26, 2007 through his return to work date would have to be repaid.

34. Senters had an office visit with Dr. Evelio on August 23, 2007. In his records, Dr. Evelio noted that Senters had had an ICD implanted by Dr. Le, and that Senters continued to have symptoms of fatigue and shortness of breath with minimal effort. Dr. Evelio also noted that Senters had a regular heart rhythm, clear lungs, and low blood pressure. Dr. Evelio stated that from a medical point of view, Senters was permanently disabled, due to his cardiomyopathy, congestive heart failure, hypertension, hyperactive cardiovascular disease, and diabetes. Although Dr. Evelio noted that Senters's risk of sudden death was drastically reduced by the implantation of the ICD, he concluded that the ICD did not change Senters's poor prognosis, especially if he did not change his lifestyle or lose weight.

35. The records of Senters's August 23 visit with Dr. Evelio were reviewed by the case manager for Senters's claim, Nicholas Trumbo, on September 11, 2007. Trumbo determined that they did not impact the denial of Senters's claim.

36. On September 19, 2007, Senters's records were sent for review to another PA, Judith Giolitto, a physician certified in family practice. She concluded that the notes from Senters's August 23 visit with Dr. Evelio did not contain sufficient information to substantiate an inability to work. Specifically, Dr. Giolitto stated that there was no evidence—such as arterial blood gases, angiography, or Senters's use of oxygen—to substantiate Dr. Evelio's conclusion that Senters's had limited functionality.

37. On September 26, 2007, a different PA, Dr. Raja Khuri, a physician board certified in occupational medicine, spoke with Dr. Evelio about Senters. Dr. Evelio told Dr. Khuri that he believed Senters was totally unable to work because of cardiomyopathy with cardiac arrhythmias and incidents of congestive heart failure. Dr. Evelio did not provide Dr. Khuri with any new medical data or records. Dr. Khuri concluded that his conversation with Dr.

Evelio did not substantiate that Senters was unable to perform work duties.

38. On September 28, 2007, after reviewing Senters's medical records, Dr. Khuri determined that they did not support an inability by Senters to perform his job duties.

39. Senters appealed the denial of his claim on October 10, 2007.

40. On October 23, 2007, Sedgwick received records from Senters's July 20, 2007 visit to Presbyterian Hospital, where he saw Dr. Le.

41. On October 25, 2007, Senters went to an emergency room, complaining of chest pains, and noting that his ICD has discharged several times. He was examined by Dr. Manish Gurumurthy, and found to have very high blood pressure, a high pulse, and a high respiratory rate. Dr. Gurumurthy stated that the remainder of Senters's exam was unremarkable, and noted that Senters was to follow up with Dr. Lammata, a cardiologist, in a week.

42. On October 26, 2007, Dr. Lammata performed several diagnostic procedures on Senters. These procedures showed moderate to severe left ventricle dysfunction, with an ejection fraction of about 50%, but otherwise showed normal results.

43. On November 1, 2007, Dr. Lammata filled out and faxed to Sedgwick a form provided by the DIP, entitled "Medical Assessment of Ability to Do Work-Related Activities (Physical)." On the form, Dr. Lammata stated that due to Senters's severe cardiomyopathy, accelerated hypertension, and diabetes, he could not lift more than five pounds, could not stand or walk for more than two hours in an eight hour work day, and could not sit for more than four hours in an eight hour work day. Dr. Lammata commented at the end of the form that Senters should be considered disabled secondary to his incapacity to work in light of his accelerated hypertension, severe cardiomyopathy, and diabetes.

44. On November 6, 2007, Sedgwick decided to send Senters's file to two other PAs.

Dr. Michael Rosenberg, a board certified cardiologist, and Dr. Pragna Patel, board certified in internal medicine, both reviewed the file.

45. On December 10, 2007, Dr. Rosenberg issued his report, concluding Senters was not disabled from his regular job for the periods of July 26 to October 24, 2007, and from November 1, 2007 onward. In his report, Dr. Rosenberg summarized Senters's claim file, including the records of Senters's visits with Dr. Evelio, his surgery and later hospital visit with Dr. Le, his hospital stay related to his ICD's firings, and his examination by Dr. Lammata. Dr. Rosenberg specifically referred to Dr. Le's description of Senters's activity level as Functional Class I. Dr. Rosenberg stated he spoke with Dr. Lammata, who told him there had been improvement in Senters's left ventricle function, and that "[Senters] could certainly do some work, based on the objective data." Dr. Rosenberg concluded that Senters was not disabled from performing sedentary job functions.

46. Also on December 10, Dr. Patel issued his report, concluding from an internal medicine standpoint that Senters was not disabled from working at his regular job. He spoke with Dr. Ramon, who stated that Senters was considered disabled only because his cardiologist, Dr. Evelio, had considered him as such due to his heart condition. Dr. Patel also reviewed Senters's medical records, and concluded that, although Senters's diabetes was not being adequately managed, it should not prevent him from performing his job duties.

47. According to a letter from Dr. Lammata dated February 25, 2008, Dr. Lammata performed a cardiac catheterization on Senters in January 2008, finding that Senters had no significant coronary disease, had dilated cardiomyopathy, and had an ejection fraction of 42%. Dr. Lammata noted that these results represented a small improvement in Senters's condition, but also noted that Senters periodically suffered from shortness of breath and chest pain. Dr.

Lammata concluded that Senters might not be able to work at his job for eight hours daily, because his job involved significant stress created by answering phone calls, and therefore, he concluded Senters was completely and permanently disabled.

48. On April 7, 2008, Dr. Rosenberg issued another report after reviewing Dr. Lammata's February 25 letter and conducting a telephone conference with Dr. Le on April 3, 2008. Dr. Rosenberg noted that Dr. Le stated during their telephone conference that Senters was Functional Class I and that Senters's stress was not a qualifier for disability. Dr. Rosenberg concluded that the additional medical information did not change his opinion that Senters was not disabled.

49. Dr. Patel also issued an additional report on April 7, 2008, after receiving Dr. Lammata's additional records. He also concluded that those records did not change his conclusion about Senters's disability.

50. On April 9, 2008, based on the medical information obtained from Senters's treating physicians and the assessments of Dr. Rosenberg and Dr. Patel, Sedgwick denied Senters's appeal.

51. Any Finding of Fact that should instead be a Conclusion of Law is hereby incorporated into the Conclusions of Law as if stated in full.

## CONCLUSIONS OF LAW

1. Where, as here, an administrator of an ERISA plan has discretionary authority to determine eligibility of benefits, the Court reviews the administrator's denial of ERISA benefits for abuse of discretion. *Corry v. Liberty Life. Ins. Co. of Bos.*, 499 F.3d 389, 397 (5th Cir. 2007). Under the abuse of discretion standard, if the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail. *Id.* at 397–98.

Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* at 398. An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence. *Id.*

2. An administrator does not abuse its discretion by relying on the medical opinions of its consulting physicians instead of the medical opinions of the claimant's treating physicians. *Id.* at 402. This is so even if the consulting physician only reviews medical records and never physically examines the claimant. *Gothard v. Met. Life. Ins. Co.*, 491 F.3d 246, 249 (5th Cir. 2007).

3. Sedgwick's decision to deny Senters's claim for short-term disability benefits was not an abuse of discretion because it was supported by substantial evidence and was not arbitrary or capricious.

4. Sedgwick's decision was based on substantial evidence. In denying Senters's claim, Sedgwick relied on reports from two PAs specializing in cardiology and internal medicine. Sedgwick's decision was further supported by statements made by two of Senters's treating physicians, Dr. Le and Dr. Lammata. Dr. Le classified Senters as Functional Class I, and expressly stated that the stress of his job did not make him disabled. Dr. Lammata, who stated twice that Senters was permanently disabled, told Dr. Rosenberg that Senters could do some work based on the objective data. The opinions of two PAs who reviewed all of Senters's medical records related to his claim, combined with the statements from two of Senters's treating physicians, constitute relevant evidence that a reasonable mind could accept as adequate to support Sedgwick's conclusion. Therefore, Sedgwick's decision was based on substantial evidence.

5. Sedgwick's decision was not arbitrary or capricious. Although Dr. Evelio and Dr. Lammata stated at various times that Senters was permanently disabled, it was not an abuse of discretion for Sedgwick to rely on the contrary views of two PAs—even though those PAs did not physically examine Senters—and on the import of Dr. Le's conclusions. Dr. Rosenberg and Dr. Patel reviewed the same objective medical data as Senters's treating physicians and reached different conclusions. Because there was a rational connection between Sedgwick's decision to deny benefits and the facts of Senters's medical status, Sedgwick's decision was not arbitrary or capricious.

6. Sedgwick did not abuse its discretion in denying Senters's claim for short-term disability benefits. Thus, Senters has failed to establish his claim for wrongful denial of benefits under 29 U.S.C. § 1132.

7. Because Senters has failed to establish his claim, he is not entitled to damages or any other relief, legal or equitable, against Defendants.

8. Any Conclusion of Law that should instead be a Finding of Fact is hereby incorporated into the Findings of Fact as if stated in full.

## CONCLUSION

For the reasons stated above, the Court finds that Senters should take nothing on his claim against Defendants, and therefore, the Court will issue judgment in favor of Defendants.

**SO ORDERED**.

March 11, 2011.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
**NORTHERN DISTRICT OF TEXAS**